First case on the docket this morning is Virgin v. Hank's Excavating & Landscaping, 5-12-0366. You'll see there are only two of us out. Judge Goldenhurst is the other judge on this panel. He has recused himself from this case, and Judge Chapman has been substituted. She'll listen to the oral arguments and participate fully in the decision on this case. So, uh, Mr. Morsegan? Am I pronouncing that correctly? Alright, you may proceed. May it please this honor to report. Counsel. Your honors, my name is Ron Morsegan. I represent the plaintiffs slash appellants in this case. Mr. Craig Virgin is with us here today. And your honors, as we all know, our overriding purpose and in fact this court's overriding purpose is to ensure that justice is done. In this case, we believe that there was misconduct at the trial court level and trial errors that prevented a fair trial for Mr. Virgin and prevented justice from being done. And today we're here before you to ask you to ensure that justice is indeed done in this case. Briefly, the core facts of this case, so you get a feel for it, are that on February 3, 2004, Mr. Virgin slipped on a patch of ice in his parking lot of his office building. He was going back into work. Suffered very serious injuries to his lower extremities. The parking lot in question was contracted to be cleared of ice and snow by the defendant, Hanks Excavating. The owner of the premises was Regents Bank and the property manager of the building was C.B. Richard Ellis. Mr. Virgin filed suit against all three. And as you know, there was a settlement between Mr. Virgin and C.B. Richard Ellis and Regents Bank. They were out of the case well before the trial. He proceeded to trial against Hanks only. One of the key issues in this case, Your Honors, revolves around that set of facts. Obviously, anybody, in any trial of the matter, I think it's a no-brainer that the mention of the other parties as being parties to the suit or being sued would be excluded because it would be highly prejudicial. That was a motion in limine that we filed. It was granted by the trial court. It's in the record. No question about it. No argument from anybody. I didn't even open my mouth. It's a no-brainer. We all know that that should not be. So you acknowledge you did not object at that time? No, it was my motion to exclude. There was no objection by anybody, and I didn't even have to argue. I mean, it was a no-brainer. I mean, everybody knew that's off limits. And the first point in this appeal, Your Honors, revolves around that order in limine. And generally speaking, as we know, violations of these orders in limine can be the basis and often are the basis of reversals in new trials. The law generally is if the violation of an in limine order, there's three things that we look at. One, is the order specific? Two, is the violation clear? And three, did the violation prejudice the moving party, in this case us, or deprive us of a fair trial? What's our standard review? I believe it's abuse of discretion on that, Your Honors. Pretty high standard. Yeah, it is. I believe, though, when we look at everything that happened, I'm hoping that you will agree with me that it was an abuse of discretion in this particular instance. There's even case law where an insinuation during closing argument that would violate the in limine order was held to be the basis of a new trial. And I cited that Cancio case as one of those which talks about how there was an exclusion where the defense counsel wasn't allowed to state something to the effect that the plaintiff was asked for a greater amount of money than he actually expects to be awarded. And in closing argument, he didn't even say that. He just said he's asking for more than he really wants. He said he'll be asking for 60. Let's split it down the middle, things like that. So there's more than one comment in that case. I think he said let's split it down the middle. Here we're talking about one statement made during closing argument of a jury trial. And there was an objection, and the trial court said it wasn't clear whether he was sustaining the objection. It has happened sometimes that a judge said, well, let's stick to the evidence in this case. It certainly could have been taken by the jury as saying there was a problem. It certainly wasn't clear. I think he just didn't hear it, honestly. I mean, I think Judge Guido, he would have been upset, clearly. It was a direct violation. In this case, the order is pretty clear. No, just an objection. Two things on that. One, according to case law, I think case after case says that's enough, and it preserves the right to appeal on that. And secondly, as you guys know, you have to make—do I highlight it even further? Is it accurate that there was no further mention of this? That is accurate. However, I think that—and really, anything—obviously, he knew exactly what he was doing. It was a blatant disregard for the court's authority, a blatant disregard for the order, and he knew he violated it at the time. He didn't say—Mr. Cunningham didn't say at the time, well, I didn't violate it. He said, well, you talked about C.B. Richard Ellis and Regence, so I can talk about him now. So he thought—I mean, there's no question he violated it. I think if we go through the three prongs, certainly the order was clear. I think that clearly he violated it when he said—he said, quote, the plaintiffs sued us. They sued the bank. They sued the management company. The direct quote is in there. So I think the only question is the third prong, prejudice. What is there outside of the fact that this statement was made and what happened at that moment that would lead us to believe that you were prejudiced? In other words, I mean the jury didn't send out any notes where they said how much did he get from the others? I mean there's nothing like that that happened, right? As far as—we don't have any reason to believe, any clear reason to believe that the jury talked about that, considered it in any way? No, we don't have any evidence of that from the jury. I just—I think it's so clear. It's one of those things that's a no-brainer as far as granting the motion. And that means everybody knows it would be prejudicial. I mean I think it's a given. It's similar to, as I tried to analogize, if I would have started talking about defendant's insurance policy and how much they offered us. I think you could raise a similar argument with that, that they even talked about it. And similar to what my opponent raised, they probably—he said they probably inferred that we may have sued him anyway, even though they didn't say that. I don't know if they could or not. Just like they could infer there's probably insurance, but still it's not—you can't get up and start talking about insurance in your closing argument. I mean I think it's so egregious that it should not go unpunished. I really was appalled. And there's no need for—there's no need for things like that. There's no legitimate reason for him to make that remark. There's only two things that I could think of that the jury could conclude from that. One, that we settled with him and got paid, so they're thinking, well, he's already got some money. Or two, I guess they could conclude that they were in the case and got dismissed, which would mean that the case was weak. But either way, they're thinking about things that wasn't in evidence that they shouldn't be and that are highly prejudicial. Even over and above the clear violation of the Unlimited Order, just the general law that it's improper to refer to matters or argue matters that are not in evidence. Or that have been excluded. So I mean even—obviously I think it's egregious because the order was there and it was clear. But even besides that, there's case law that says you just—it's a no-no. I mean you can't argue things that are not even in evidence and try to draw inferences and get the jury to think about tangential issues that aren't— that there's nothing to support that particular issue in the record. The point you raised, Your Honor, and my opponents breathe, trying to argue that they thought that the let's stick to the evidence somehow cured this. I think there's case law that says that that's not the case. And even stuff that I decided from the Supreme Court where I think the court said even where the objection was actually sustained, counsel was rebuked, and the jury was instructed not to disregard, they still found it was so—you know, you can't unring the bell. It was so egregious, the violation of the order, the Unlimited Order, that they reversed on those grounds. But the case that they cited, the LaCroix case, was a lot different as far as what the judge said. He actually sustained that order and made a, you know, a detailed statement about—to the jury that they should not, you know, this is not evidence, they should remember the evidence as they see it, not what the attorney said. It's quite a bit different than the let's stick to the evidence. I really—I think highly of Judge Guido, and I really believe that—I don't think he heard that statement. That's the only thing I can conclude, because he would have got—he would have been very upset, I believe. He may have— You don't have—you have no evidence of that. I mean, there's no record that the court said I didn't consider it, I didn't hear it. No, sir. And we can come back to that if you gentlemen would like. The second point revolves around documents that were admitted into evidence that I believe should have been excluded as a sanction for a discovery violation. I'm talking about Defendants Exhibits 8 and 10. They were the key documents of their case. One was what they call a snow removal timesheet, which is a timesheet of one of their workers saying—reporting to say what he did to the parking lot that day. And the second was an invoice for that particular work. And the key in this argument, Your Honors, revolves around realizing the difference between four documents. The documents in question, Defendants Exhibits 8 and 10, which are in the appendix at A15 and A16, which are the original— Those are the exhibits you contend were not produced? Exactly. And your opponent says they were produced. Exactly. This argument, we need to focus on the two—Exhibits 8 and 10, which are in Appendix A15 and A16, and contrast that with A11 and A12, which are— The best way to refer to those, and I refer to them as HEX HEX 4 and HEX 5. Those are the documents that were produced in five years of discovery. The only documents produced with regard to what was done at this property on that day. And the only difference between these two is that one set shows they have been faxed. Otherwise, the documents are the same. I believe that to be correct. The documents that were produced have the facsimile notations at the top, which shows that they were—and I think it's important—they were received by HEX. On March 23, 2006. And they were faxed. If you take their discovery disclosures to be truthful, which we have to do, and we have to assume that people are compliant with the rules, then that would mean that this is all that they've got. They've got the originals of the faxes that they've received, but that's a different document. However, you all along through discovery knew that there was a snow removal timesheet purported to have been prepared by an employee of the defendant that he had put chemicals on the parking lot. And that there was an invoice to bill for that that had been created from that timesheet. Purportedly. And we asked several times for additional documents, and they gave us, but never the originals. So it led us to believe that these were the only documents that they would have. You had a plan that you were going to get them excluded from that. Well, if you—and that's basically—yes, that's absolutely true. Because if you look at the discovery depositions of their witnesses, they could not—neither of them had any independent knowledge. They were all relying on the documents. And at that time, this is all we thought we had. But they clearly had no independent knowledge.  And then secondly, Mr. Gary himself, which was the manager, he wasn't a fielder. So he had no knowledge, personal knowledge, of what happened actually at the site. But he even said, I can't—him saying, and it's in the record, I cannot verify that this fax is an accurate copy of the original. He said—his word—he voluntarily said, it could have been tampered with. It's a fax. We don't know. So everything up to that point led me to believe I had a pretty good shot at getting these. And this was all the documentary evidence that they had at that point. What about the man who made this—who created the snow removal time sheet, Joe R., I can't remember his last name. Renicker. Yeah, Renicker. Did you depose him? Yes, sir. What did he say about those? He said he had no independent recollection of what happened. Of actually doing that. No. And he said, you know, it was one of the stops on his route. He talked about, in general, you know, the procedure he'd go through and what he may have done or what he usually would do at the site. But nothing in particular on, you know, with regard to this particular day at this particular spot. And then he had no knowledge of—I tried to ask him about faxes and so forth, but he had no knowledge about faxes or anything. All the evidence that I had— Did he identify his handwriting? That he's the one who had completed this? Yes. So although he didn't remember doing the work, he was able to say, yep, I filled that out. I believe so. And did he say, and if I filled that out, I did what's on there? I'm not sure about that. He didn't say that at trial? I think he probably did. But in the way I was thinking about it, it was clear everything revolved around these two guys. Because they were referring to me. If it said that they put banana peels on it, they would say, well, that's what I did. So my thinking was if I could let them try to testify, and it was clear in trial, too, and the judge even said it, it's clear he's got no independent recollection. But if I could then get these knocked out, it would just cut the legs out from under them as far as what was done on the property that day. He has no independent recollection. Why are you in any better position to get the documents knocked out, whether it's the facts, claims, or the originals? I mean, we're not talking about the discovery foundation right now. Well, because I think that his testimony and both of them don't know what happened out there. But the documents are, I'm just going to defer to the documents. I'm paraphrasing. So if I get the documents knocked out, then it cuts, one, cuts some of their credibility, and two, it just basically washes out their testimony because they have no evidence that they did anything out there. Secondly, the backup, I mean, there's several points where I think these are very important. That is number one. If they would have been allowed in, at that point all we had was the facsimile transmissions, no other documents that they ever produced for the same spot on different dates and for different spots on the same date. So all the other ones that look exactly like this, you know, the snow removal timesheet and the invoice, all those were originals. So it's throwing up a red flag. Why would this one be faxed to them? You know, why weren't any of the others? And then you've got Mr. Gary saying, you know, it was a fax. It could have been tampered with. And you've got the fact that what we brought out is that we had asked C.B. Richard Ellis. We didn't say there were parties at the scene. We didn't say we sued them. But we wanted to make sure we made the point that we asked the owners, if you think they'd receive an invoice, you know, we asked them for documentation. They didn't have an invoice. They didn't have any evidence of any work done on the property that day. And they didn't have any evidence that anything was paid for this. All these red flags are calling a question as to the veracity of the documents. Of course, we didn't know that they were originals until the last day of trial. So it was also important for our, just our, as I mentioned in the brief, our analysis of the case and settlement and whether we, you know, take the settlement offer or not. So these documents, and the reason the case law talks about the importance of documents, and that goes to, you know, whether the inclusion of them in evidence would be prejudicial. It's the same, really two sides of the same coin. So the very importance of these documents, the fact that they are so key, is why I think that it's prejudicial that they were allowed in. The final point. Once again, here, the standard would be abuse of discretion. And finally, it seems ironic to me that before trial, in defendants' motions eliminated, they had a motion eliminated that was granted. It's obvious, too, just like mine was. But theirs was, you know, anything that wasn't disclosed for discovery should be excluded. Obviously, that was granted. And their reasoning… Just finish your thought. Their reasoning was, quote, it would be extremely prejudicial and cause unfair surprise to the opposing party or parties if such evidence was given. So obviously, before trial, they think such things would be very prejudicial. And now, afterwards, they're saying, well, you know, it really didn't do it. You know, we violated the rules, but it really didn't hurt you. Okay. You get a chance to rebuttal. Thank you, sir. All right. Ward. Ward? Mr. Ward? I was reading my own handwriting. May it please the Court? Yes, sir. Counsel, Mr. Virgin. Good morning. My name is Mike Ward. I'm present this morning on behalf of the Apple Leaf Banks Excavating and Landscaping Company. As the Court noted earlier, the plaintiff has raised two points of appeal, one dealing with closing argument, one dealing with the addition of evidence. Both points are governed by the abuse of discretion standard. Plaintiff's counsel began with this closing argument point, and I would address that first, too, in my argument. Plaintiff intends that Hanks Excavating violated the Court's motion to eliminate. The eliminate order had two components. One, there was to be no mention that Regents Bank and QB Richard Ellis were parties to this lawsuit and that there had been a settlement. There were two prongs.  At trial, it was plaintiff's counsel who first introduced the idea that Regents and QB Richard Ellis were parties to the lawsuit. I direct the Court's attention to page 603 of the transcript. This is plaintiff's counsel examining Mr. Gary, who was the manager for Hanks. Mr. Gary, are you aware that in this lawsuit, there was also formal request made to CB Richard Ellis and Regents to give us documents showing what work was done by Hanks? Are you aware of that? So plaintiff's counsel in its examination of Mr. Thomas, or Mr. Gary, excuse me, introduces to the jury open court that in this particular lawsuit, that Regents and QB Richard Ellis were parties to this lawsuit. But he just says that he got documents from them. He made formal requests to them in this lawsuit. That doesn't mean he sued them. But in this lawsuit, though, and I'll then turn to the Court's page 617 of the transcript. And again, he says, are you familiar, within this lawsuit, are formal requests to CB Richard Ellis and Regents Bank. And again, there's no statement that he sued them, but he does say that in this lawsuit, he made formal requests to them. And so that's no more, it brings the Court's attention to the jury's attention, Regents and QB Richard Ellis. And it's no more a violation or introducing the idea than the closing argument made by my partner, John Cunningham, closing argument. And plaintiff's argument ignores that plaintiff invited the response, the very argument that was made by Mr. Cunningham at trial, It's a little hard to put what he said in the closing argument into the context of making a formal request for documents to these two of them. It is in the context, Your Honor, though, that it was a theme of sorts by plaintiff's counsel, but it's also part and parcel of point one, that somehow hangs fabricated evidence through the facsimile copies that were produced in discovery. And Mr. Cunningham's argument, the closing argument, was a direct response to the argument made by plaintiff's counsel. And I would ask the Court's attention on page 665 of the transcript. And this is plaintiff's counsel, and he's trying to insinuate before the jury that there are problems with the evidence that were produced, the fax copies. And at page 665 of plaintiff's closing argument, plaintiff's counsel goes, And we just thought it was awfully strange that all the documents were just copies of original set for our location in our day, like the invoice. And it was faxed to Hanks on March 23, 2006, and no other ones were faxed. I mean, they couldn't produce the original of the fax. First of all, why would anyone, why would their invoice be faxed to themselves? It's just kind of odd. And Mr. Cunningham's closing argument, which is the subject of the point of appeal, addresses that very point that's made by plaintiff's counsel. And I direct the Court's attention to page 680 of the trial transcript. Well, do you think that perhaps when this lawsuit was filed, people wanted to see what happened that day out there? And so these copies were faxed. Do you suppose maybe that's why? That's the only location that they were concerned about, and that's the only invoice that has a fax on it. And so the argument there that's the subject of plaintiff's objection, which introduces the documents, is in response, a direct response to an argument made by plaintiff's counsel. In the context of the case you're unaware of, introducing the idea of Regents and C.B. Richard Ellis, in this lawsuit, plaintiff's counsel referenced them in this lawsuit, although they didn't say they were a party. But it says, in this lawsuit, I direct a formal request to them for production of documents. He invites the argument that's the subject of this objection to closing argument. And in the context of the case as a whole, the trial court did not abuse its discretion. The argument that was made by Mr. Cunningham was their response to plaintiff's closing argument concerning calling into question the facsimile documents. Judge Clito, I personally was present at the trial, but there's no indication in the record that Judge Clito was not fully apprised of the record, especially in the post-trial motions, that if, as plaintiff's counsel asserts, that Judge Clito did not hear this publicly and did not hear the argument, he was perfectly free at the time in the post-trial motions to be fully apprised of the evidence, review the record, and rule accordingly. And, of course, Judge, we're here today because Judge Clito denied plaintiff's post-trial motions. At bottom, in the context of plaintiff introducing the idea, C.D. Richard Ellis, regents in the case, make a direct and formal request to them in this lawsuit. And the fact that plaintiff's counsel invited the argument, there was no abuse of discretion with respect to closing argument, how the court conducted the closing argument. Plaintiff's first point of appeal, which he addressed second, concerns Defendants Exhibits 8 and 10, which are the snow removal timesheet and the invoice for that work. Again, the admission of that evidence was discovered by the abuse of discretion standard. Plaintiff's counsel suggests that the facsimile copy was produced at discovery five years before trial, and then the original documents that were produced at trial, pursuant to Plaintiff's Rule 237 request, gave rise to the possibility of tampering. But as in the plaintiff's appendix and in the record on appeal, there is essentially no divergence, there's no discrepancy between the facts documents and the original documents. They're exactly the same? They're exactly the same. Was there a request for the originals? No, there was a request for production of the records, and then at trial, Plaintiff's counsel submitted a Rule 237 request for the original documents. At trial? At trial, yes, Your Honor. And so during the course of discovery for five years, the plaintiff's counsel had benefit of the facsimile copy that was produced by Hanks and Discovery. It was used to examine witnesses. In fact, it was a key exhibit for Joseph Reniger's deposition. It was Exhibit 2 to Joseph Reniger's deposition. It was relied upon by plaintiff's expert, Rodney Walter, and it was replete throughout the evidence. In fact, Mr. Virgin testified at trial that he had reviewed those exhibits and had questions about them. They were over and over again throughout the trial, as outlined in our brief. Exhibit 5, which is the facsimile copy, which was admitted into evidence without objection. Exhibits 8 and 10, which were admitted into evidence. Even Plaintiff introduced the same documents as Plaintiff's Exhibits 13 and 16. There's no discrepancy between any of these documents. And with respect to the question of prejudice, I guess going back to this, with respect to the burden of the plaintiff, with respect to this complaint about the discovery practice, I would ask the Court to consider the case Cohen v. Northern Trust, as cited in our brief. In that case, the party produced a redacted document in discovery. At the time of trial, the original document was no longer available for production. And the Court of Appeals upheld the trial court's ruling, saying that Plaintiff didn't exercise due diligence in seeking the production of the original document. Here, if Plaintiff's counsel, when the facsimile copy was produced, had any question about the facsimile copy, Plaintiff's counsel was free to request an original before trial. Instead, what we have here is Plaintiff submitting a Rule 237 request to trial for the original documents. Hanks produces the original documents at trial, and then Plaintiff's counsel objects to them. With respect to Exhibits 8 and 10, there, again, there was no prejudice. The contents of those documents were before the jury. Rodney Walters, the plaintiff's expert, testified that he relied upon them in developing his opinions. They were used to refresh Joseph Reniker's testimony, his recollection of the events in the day. One critical fact that refreshed his recollection was that he remembered, after looking at and reviewing the document, that it referred to flakes, calcium chloride flakes and not pellets. And that reminded him that on this particular day was the very first time that he used calcium chloride flakes. And so the evidence was properly admissible as he refreshed his recollection. Mr. Virgin testified about the documents. Exhibit 5 was legitimate evidence. And Plaintiff also introduced them as Plaintiff's Edicts 13 and 16. And finally, at the conclusion of the trial, and I would ask the court director's attention to page 625 of the trial transcript, Plaintiff's counsel abandoned his objection to Exhibit 8 when the court and counsel are going through the exhibits. Mr. Cunningham, number 8 is the original Snowden timesheet the court admitted. There's no objection on the record to Exhibit 8 at that point in time at the end of the case. And under the context of the trial as a whole, the objection was abandoned at that point in time. And finally, with respect to our appeal, the offense of our trial court's judgment, we raised in our brief the failure of Plaintiff's counsel to make a submissive case. The law was settled in Illinois. When you said your appeal, did you file a cross appeal? We did not file a cross appeal, Your Honor. I do not believe in defending an appeal to raise submissibility as a point without filing a cross appeal under Illinois civil practice. And we did that as a final point in our brief that Plaintiff's counsel failed, that Plaintiff failed to make a submissive case against a snow removal contractor. Under Illinois law, a snow removal contractor can only be found negligent if in the course of doing its duty and removing snow or ice, it creates or aggravates unnatural accumulation of ice or snow. In the record before the jury, before the trial court, there was no evidence of that exacerbating or creating an unnatural or aggravating an unnatural accumulation of ice or snow. Does that rule apply to a snow removal service? Yes, Your Honor. It specifically applies to a snow removal service. In the case of Williams v. Seabird Landscaping, the court addressed the standard of care for a contractor who has been retained to remove snow. And this is the court's standard for submission of ordinary negligence against a contractor. At page 757 of the opinion. It's 407 Illinois Ab. 3rd, 753 at page 757. The mere removal of snow which may leave a natural ice formation remaining on the premises does not in itself constitute negligence. A snow removal contractor negligently removes snow if it creates or aggravates an unnatural accumulation of ice or snow. And here there was no evidence that Hanks created an unnatural accumulation of ice or snow or aggravated an unnatural accumulation of ice or snow on the property. Mr. Virgin testified that as to the spot where he slipped and fell that there was no ice there when he arrived. Later he came back to the property and he slipped and fell. So in the intervening time, ice accumulated, but there's no connection to that spot, to that ice on which Mr. Virgin fell, to the work that Hanks actually performed on the property on that particular day. And for that reason, I just don't know the specific case and the fact that the trial court did not abuse its discretion in governing closing arguments or division of evidence. On behalf of Hanks, I respectfully request the court to affirm the trial court's judgment. And I'll conclude if the court has no further questions. Thank you, Your Honor. Rebuttal. Thank you, Your Honor. I guess I'll go in reverse order. The last on the submissible case issue, the IPI is pretty clear that when you're talking about a contractor alone, it makes that distinction. The unnatural versus natural accumulation is not an issue. It's right in the IPI. They didn't ask for any different type of construction that was given to any higher standard, and that's not the law. And there was actually a motion in Lumine granted that said you can't talk about natural versus unnatural. So I think that point is meritless. The question is, I think this needs to be pointed out. Hopefully I made it clear in my brief. The objections to Exhibits 8 and 10 weren't really objections. I mean, they were motion for sanctions pursuant to 219C for discovery violation. It wasn't an evidentiary objection saying that they, you know, the court was. It wasn't an evidentiary violation saying that they. And that objection or that motion for sanctions was because they had never produced a copy of the original without the facts. Right. And in the briefs both of us have cited, there's like six factors you go through for the abuse of discretion. If you go through each of those, surprise to us, of course we were surprised. We're entitled to believe that they're being truthful and that when they send us a document, they've got the original of that document, meaning the original, something that they receive, the facts, they receive the original. They copy that and they give us a copy. That's what we thought they had. So if a party in a case gets a discovery request and they've got a document, and let's say it's been faxed five or six different times to different law firms or whatever, they have to produce that same document, a copy of every iteration of it where it's been faxed to somebody else or whatever? I think they do if they have those in their possession. Even though everything except that fax notation is the exact same document? I believe so. I tried to give a simpler hypothetical with a document with a post-it on it. Say the post-it says, receive March 23, 2006, and then they've also got the original. Well, if they just copy the one with the post-it and send that, that would look, and it's a little bit different because the post-it can be removed. Our case is strong, but it would lead someone to believe they received that on March 23, 2006, and that's the only copy they've got. And they're supposed to seasonably supplement. But I just want to make sure you guys know, there was no waiver because when they offered the – my motion for sanctions was denied, obviously, and so he said they could come in. I didn't – there was no burden on me to keep asking the judge to reconsider that motion. So when I didn't object on an evidentiary ground as far as a proper foundation to one of them, I objected to one but not the other. That's not a waiver of my motion for sanctions. And then third, there's no – you spent a lot of time on this thing that I invited by talking about C.B. Richard Ellis and Regions and how we asked them for documents in this lawsuit. Well, obviously, it's in this lawsuit. You can ask for – by a subpoena or whatever. We made it very careful to make sure we didn't say they were a party, we didn't sue them. We just wanted to make the point that they were asked for documentation and they couldn't support anything. So I don't think that invitation argument has any merit at all. And my final statement, gentlemen, is that I think if you look at the facts and the law, there's ample facts, especially with regard to the uneliminated motion violation of the blatant, and it shouldn't go unpunished. I mean, it just shouldn't. But there's ample facts in the record, and the law is there to support you. I realize it's an abuse of discretion standard, but you could easily, if you wanted to, everything's there to support a decision to reverse this judgment, give us a new trial, or reverse it and just give us a new trial on damages. I mean, likewise, if you wanted, you could say, well, we disagree with them, but it's not an abuse of discretion. I realize that, but it's there. And I leave it in your hands. I appreciate your time. We appreciate everything today. Have a good day. Thank you, sir. Thank you both for your briefs and your arguments. We'll take this matter under advisement and issue our decision in due course. We're going to take a brief recess and return to the full panel.